IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2014 MAR 19   AM 9: 22

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY

CENTRAL MUTUAL INSURANCE COMPANY,
Plaintiff,

-vs-                                                    Case No.  A-12-CA-275-SS

WHITE STONE PROPERTIES, LTD.,
Defendant.

_____

## O R D E R

BE IT REMEMBERED on the 4th day of March, 2014, the Court held a bench trial in the above-styled cause, and the parties appeared by and through counsel.  The trial of this matter lasted one and one-half days, and the Court heard testimony from the following witnesses: Bill Sellers, Rick Coulter, Steve Cagle, Curt Vogel, Bruce Lipshy, Lauren Laurent, and David Winn.  Having considered the evidence and testimony presented at trial, the arguments of counsel, the parties' briefs, and the governing law, the Court enters the following findings of fact and conclusions of law.

### Background and Findings of Fact

On January 11, 2010, Central Mutual Insurance Company (CMI) received an insurance claim from White Stone Properties, Ltd. (WSP) concerning hail damage to the roof a building located at 9900 Spectrum Drive, Austin, Texas (the Spectrum Building), which occurred on or around May 25, 2009.  WSP, owner of the Spectrum Building, had a Building Owner's Policy issued by CMI (the Policy), which incorporated a Building and Personal Property Coverage Form, and WSP paid a premium in order to get replacement cost coverage.  WSP's insurance claim was covered under this Policy.

CMI hired Lon Smith Roofing to inspect the Property and prepare a roof replacement cost estimate. The type of roof on the Spectrum Building at the time of the hail damage was a modified bitumen roof. Lon Smith Roofing prepared an estimate for the cost to replace the damaged modified bitumen roof with a new modified bitumen roof. This roof replacement cost estimate totaled $1,768,052.19, which included $134,747.63 in sales tax. Pl.'s Trial Ex. 4. This estimate did not provide for a general contractor and its overhead or profits. Lon Smith Roofing also estimated the cost to replace the corrugated siding and to flash around forty-one windows was $83,294.05, which included $6,348.05 in sales tax. *Id.*

Based on this estimate, CMI calculated the actual cash value of the roof under the policy, which was the replacement cost less depreciation. CMI made an actual cash value loss payment of $1,238,863.85 to WSP. *See* Pl.'s Trial Ex. 5 (describing CMI's calculation of this figure). This payment included sales taxes of $141,095.68. The withheld depreciation for the roof amounted to $482,690.60, and it is this money WSP contends it is entitled to in this lawsuit. Steve Cagle, CMI's corporate representative and the insurance adjuster who handled WSP's claim, testified there is no basis described in the Policy for withholding depreciation, but pointed out the Policy states CMI will not pay on a replacement cost basis until the damaged property is actually repaired or replaced. CMI forwarded the actual cash value to WSP up front but withheld depreciation until the repairs were complete and final costs calculated.

CMI made two subsequent payments to WSP for other damage to the Spectrum Building related to the roof damage. First, CMI paid WSP $95,527.04 in a settlement of repairs for lightning protection and ISO board. Second, CMI paid WSP $109,840.00 for interior damage and damage to

the exterior metal panels found during the re-roofing.  Therefore, CMI's total payments to WSP amount to $1,444,230.89.

After receiving these checks, WSP alleges it sought bids from contractors to do the replacement work.  Ultimately, WSP alleges it accepted a bid from Laurent Enterprises, LLC, d/b/a Innotech Construction (Innotech).  Laurent Enterprises had been formed by Jason Laurent and Lauren Laurent, who are brother and sister.  Jason Laurent had handled the maintenance for the Spectrum Building for some time prior to the hail damage and long before obtaining the contract to perform the replacement work for the hail damage.  Jason Laurent continued to do the maintenance until the property was sold.  The contract between WSP and Innotech was for "Insurance Proceeds Received Only," and David Winn, the owner of WSP and the Spectrum Building, testified he entered the contract knowing he and WSP would never have any liability other than whatever insurance proceeds were received.  *See* Def.'s Trial Ex. 12, at C0124.  In addition, under the contract neither David Winn or WSP could be sued by Innotech.  Innotech placed its contract price with WSP at $2,450,450.02.  Lauren Laurent testified—and the numbers show—this figure was determined by taking the figures from the Lon Smith Estimate, adding 10% for overhead, 10% for profit, and sales tax.  The Lon Smith Estimate was based on replacing the existing modified bitumen roof with a new modified bitumen roof and already included sales tax.  After signing the contract, WSP and Innotech decided to install a TPO roof, which was considered superior to a modified bitumen roof and had a longer warranty.  Innotech then hired a roofing subcontractor, CEI Roofing Texas (CEI), and the replacement work for the damaged property was completed in a timely fashion.

After the completion of the new roof, Innotech and WSP then went back to CMI in order to recover the withheld depreciation, but when CMI sought documentation from WSP regarding the

cost to replace the damaged property, CMI discovered information which would ultimately lead to its decision to refuse to provide WSP with the withheld depreciation.  The amount in controversy is the amount retained by CMI.

CMI, in its quest to determine the replacement costs, received a packet of information from public adjuster Eric Raisman, which indicated Innotech's contract sum for the work performed amounted to $2,450,450.02.  Around this same time, CMI learned from a commercial building permit application filed by the roofing subcontractor, CEI, that CEI performed the roofing work on the Spectrum Building for approximately $802,225.  *See* Pl.'s Trial Ex. 23.  Steve Cagle testified the discrepancy between Innotech's claimed contract figure of roughly $2.45 million and CEI's figure of roughly $800,000 caused him significant concern about providing WSP with additional payment because CMI had already paid roughly $1.4 million with $1,238,863.85 allocated for the roof.  Accordingly, Cagle sought a copy of the CEI subcontract with Innotech, which he eventually obtained.  CMI then conducted an Examination Under Oath (EUO) of Jason Laurent.  This examination was unhelpful, though, because Jason Laurent provided vague answers and claimed a lack of memory as to most of the important questions at issue.  Through the CEI contract, Cagle discovered Innotech, as the general contractor for WSP, had hired CEI, the subcontractor, to remove the existing modified bitumen roof and replace it with a TPO roof manufactured by Versico, not a new modified bitumen roof.  CEI also was to replace the damaged corrugated siding.  CEI's price for its work totaled $811,004.  The parties stipulated the TPO roof was of comparable quality and material as a modified bitumen roof.

Rick Coulter, CEI's project manager for work performed on the Spectrum Building, testified CEI was paid a total of $816,852.00 to remove the existing bitumen roof and install the new TPO

roof. This figure included the $811,004 contract price plus a $5,848 change order for replacement of some of the existing ISO that had become wet. He testified CEI paid for all of the materials, obtained the insurance for the project, paid for the permit, provided all of the workers, and oversaw all of the safety measures for the project. In sum, Coulter described it as a "turnkey job" for the completed new roof. Coulter testified Jason Laurent and Innotech had a minimal role, and he merely communicated with Laurent to let him know what sections of the roof CEI would be working on a particular day. Jason Laurent would then notify the tenants of the building. Coulter further testified the TPO roof is an extremely tough membrane, is at least as tough and durable as the modified bitumen roof, and CEI gave a thirty-year warranty on the TPO roof while a warranty of more than twenty years is not possible with a modified bitumen roof. In short, Coulter testified the "80-mil TPO" roof which was installed on the Spectrum Building is one of the higher quality roofing systems and is of a higher quality than the modified bitumen roof.

Curt Vogel, CEI's on-site and daily supervision project manager for the work performed on the Spectrum Building, testified substantially the same as Coulter. Vogel, unlike Coulter, was physically on-site on a daily basis, and he testified CEI performed all of the re-roofing work. According to Vogel, Jason Laurent was merely there to serve as an intermediary to the tenants and to coordinate scheduling. Vogel testified Laurent did no work to actually remove the existing roof or install the new roof, and it was important for CEI exclusively to handle all of the work for liability purposes.

Cagle, CMI's representative, testified it is CMI's position it has already paid more than the replacement cost value on the project—the $816,852 value of the CEI contract—when it paid WSP the actual cash value of the roof—the $1,238,863.85 derived from the Lon Smith Estimate.

Therefore, CMI does not believe WSP is entitled to further payment under the policy.  Cagle testified while he did not know what Innotech's costs were on the project, he could not think of any costs incurred beyond those incurred by CEI to complete the installation of the new roof.  Cagle further testified that even adding a standard general contractor's fee of 10% overhead and 10% profit to the $816,852 value of the CEI contract, the cost for the lightning suppression repairs actually performed, the HVAC repairs, and even the amounts for exterior metal panels and interior damage (even though these items have been settled), the resulting figure is still less than the $1,238,863.85 already paid. These numbers roughly break down as follows:

| Payments Made by CMI | |
|---|---|
| Roof | $1,238,863.85 |
| Lightning Suppression | $25,603.60 |
| Corrugated Siding | $69,923.44 |
| Metal Panels | $109,840.00 |
| Total | $1,444,230.89 |

vs.

| Actual Replacement Costs Plus 10 & 10 | |
|---|---|
| Roof, Siding, and ISO Board | $816,852 |
| Lightning Suppression | $17,500 |
| HVAC | $48,450.54 |
| Metal Panels | $71,560.00 |
| Interior Damage | $38,280.00 |
| Subtotal | $992,642.54 |
| 10% Overhead | $99,264.25 |
| 10% Profit | $99,264.25 |
| Total | $1,191,171.04 |

Through the course of the trial, it became apparent no party could explain Innotech's work, expenses, or efforts, including Lauren Laurent.  Ms. Laurent[1] testified Innotech was formed to be a construction company with a web applications component, but this entity's actual experience was

---

[1] Jason Laurent was not called as witness.

extremely limited. Innotech had performed a handful of small construction projects for David Winn and his related companies in the past. Innotech had also done some work for Legal Zoom. Prior to being hired for the Spectrum Building roofing project, Innotech had absolutely zero experience with roofing work, and Innotech has performed no roofing projects since. Ms. Laurent testified Innotech was entitled to 10% of overhead and 10% of profit as part of its contract with WSP. She explained she calculated the figure of roughly $2.45 million—the supposed contract price for Innotech's work for WSP—by taking the Lon Smith Estimate, adding 10% overhead, 10% profit, and sales tax. She testified no one told her the Lon Smith Estimate was actually based on replacing the existing modified bitumen roof with a new modified bitumen roof. Nevertheless, her spreadsheet calculating $2.45 million indicates these numbers are based on replacing the existing modified bitumen roof with a new TPO roof. By the end of her testimony, Ms. Laurent acknowledged the $2.45 million figure is incorrect and is based on the Lon Smith Estimate only. She claimed some appraisal or meeting was to occur to determine how much the contract price actually should have been, but this never happened.

The following is a comparison between the Lon Smith Estimate's calculations versus the calculations supposedly underlying the Innotech contract with WSP. *See* Pl.'s Trial Ex. 44 (demonstrating Innotech's use of Lon Smith Estimate to calculate its $2.45 million contract price). First, Lon Smith's Estimate breaks down as follows:

| ITEM | REPLACEMENT COST VALUE |
|---|---|
| Roof | $1,608,968.67 |
| Lightning Suppression | $33,859.38 |
| Corrugated Siding | $83,294.05 |
| Metal Panels | $71,560.00 |
| HVAC | $48,450.54 |
| Interior Damage | $38,280.00 |
| Total | $1,886,412.64 |

Second, the Innotech calculations of their $2.45 million contract, which essentially takes the Lon Smith Estimate, adds 10% overhead, 10% profit, and sales tax:

| ITEM | REPLACEMENT COST VALUE |
|------|------------------------|
| Roof | $2,090,050.30 |
| Lightning Suppression | $46,581.33 |
| Corrugated Siding | $108,198.97 |
| Metal Panels | $92,956.44 |
| HVAC | $62,937.25 |
| Interior Damage | $49,725.72 |
| Total | $2,450,450.02 |

Throughout her testimony, Ms. Laurent was not able to explain the records and books of Innotech, nor what Innotech's actual costs were on the project, if any. For instance, she could not explain or justify the numbers in Innotech's Applications and Certificates for Payment. *See* Pl.'s Trial Ex. 22. In addition, Ms. Laurent acknowledged Innotech received over $1.4 million in checks from WSP during 2011, but Innotech's tax return listed $413,876 in gross receipts for 2011. *See* Pl.'s Trial Ex. 40. The tax return further indicated Innotech did not pay any money to employees or any compensation to officers. The total expenses for 2011 were listed at $33,175. All of these numbers are inconsistent with Innotech's alleged work as a general contractor on the Spectrum Building and its receipts of at least $1.4 million in checks from WSP. Ms. Laurent simply could not explain where the $1.4 million, beyond the $816,852 paid to CEI, went. She was confronted with a spreadsheet she made in which she calculated Innotech's overhead to be $276,351.28, but she could not explain her numbers whatsoever. *See* Pl.'s Trial Ex. 50. The spreadsheet, on its face, made little sense, including figures like Ms. Laurent's personal income taxes as well as sales tax, which had already been included in the Lon Smith Estimate. Ms. Laurent could offer no explanation.

By the close of Ms. Laurent's testimony and the trial, the record was clear there was no reasonable justification for why and how Innotech could be making a claim for over $2 million to re-roof the Spectrum Property when the subcontractor who did essentially all of the re-roofing work charged only $816,852. In addition, there is ample evidence in the record to support the Court's finding there was little-to-nothing legitimate about Innotech's role as a general contractor on this project.

CMI filed this lawsuit in March 2012 seeking a declaratory judgment they have no further liability to WSP. WSP believes it is entitled to the proceeds calculated as the withheld depreciation and filed counterclaims for: (1) a declaratory judgment; (2) breach of contract; (3) breach of the common law duty of good faith and fair dealing; and (4) violations of the Texas Insurance Code. CMI filed a motion for summary judgment, and WSP filed its own motion for partial summary judgment. Unable to untangle this mess and unclear on some of the factual determinations, the Court ordered a bench trial, which occurred March 4–5, 2014, and carried the parties' motions for summary judgment. Because the case could not be completed without a trial and presentation of evidence, the motions for summary judgment were inappropriate and are DENIED.

## Conclusions of Law

Based on the record, the findings of fact at trial, and the terms of the insurance policy at issue, the Court concludes CMI has complied with its obligations under the Policy and is not liable to WSP for further payment.

### I.    Contractual Claim

At its core, this case comes down to interpreting the insurance contract between the parties. The interpretation of an insurance contract is governed by the same rules of construction applicable

to other contracts. *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998). In construing a contract, Texas law requires the Court to strive to effectuate the intentions of the parties as they are expressed in the contract. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). If the policy language is unambiguous, it must be enforced as written. *Upshaw v. Trinity Comps.*, 842 S.W.2d 631, 633 (Tex. 1992). If the language is ambiguous, the construction which affords coverage must be adopted. *Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977).

The section of the Policy at issue in this case is Section G(3), the Replacement Cost Provision. *See* Pl.'s Trial Ex. 1, at 25. It is undisputed WSP paid extra for the premium replacement cost insurance coverage. To understand the Replacement Cost provision in this contract, the Court will proceed through the relevant portions of Section G(3) step-by-step.

First, Section G(3)(a), (c) provides:

3.     Replacement Cost

     a.     Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

    . . .

     c.     You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

*Id.*

This language is clear and unambiguous, and courts have routinely enforced replacement cost coverage provisions. *See Ghoman v. New Hampshire Ins. Co.*, 159 F. Supp. 2d 928, 932 (N.D. Tex. 2001); *Kolls v. Aetna Cas. & Sur. Co.*, 378 F. Supp. 392, 403 (S.D. Iowa 1974), *aff'd*, 503 F.2d 569

(8th Cir. 1974); *D & S Realty, Inc. v. Markel Ins. Co.*, 816 N.W.2d 1, 14–15 (Neb. 2012).  In *Ghoman*, the court, in describing contract language identical to the language above, noted "[i]t allows the insured to *either* make a claim for replacement costs, up to policy limits, or actual cash value supplemented by additional replacement cost coverage."  159 F. Supp. 2d at 932.  "The purpose of this two-step process is to enable the insured to obtain funds 'to begin the process of repair or replacement, at which point [the insured] could submit claims for expenditures that went above the actual cash value of the loss.'"  *Id.* at 933 (quoting *Fraley v. Allstate Ins. Co.*, 97 Cal. Rptr. 2d 386, 390 ( Cal. Ct. App. 2000)).  In other words, "if the insured has contracted for replacement cost coverage, the insured will normally be entitled under the policy to an immediate payment representing the actual cash value of the loss, which can be used as seed money to start the repairs." *D & S Realty*, 816 N.W.2d at 15–16.

In this case, WSP, covered by replacement cost insurance, submitted a claim for hail damage to the roof of the Spectrum Building.  CMI then obtained the Lon Smith estimate of $1,768,052.19 to replace the existing modified bitumen roof with a new modified bitumen roof.  This figure is the estimated replacement cost.  CMI then withheld depreciation to arrive at an actual cash value of $1,238,863.85, which CMI paid to WSP.  WSP could then take this payment and use it as up-front seed money to start the repairs on the roof.  WSP did use this money toward paying CEI (through Innotech) for the roof repairs.

Second, Section G(3)(d) provides:

d.     We will not pay on a replacement cost basis for any loss or damage:
    1)     Until the lost or damaged property is actually repaired or replaced; and
    2)     Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

Pl.'s Trial Ex. 1, at 25.

This provision is also clear and unambiguous and explains the amount paid as equivalent to the withheld depreciation. The insured is not entitled to recover replacement cost damages until the insured actually repairs or replaces the damaged property. *See Versai Mgmt. Corp. v. Clarendon Am. Ins. Co.*, 597 F.3d 729, 737–38 (5th Cir. 2010); *Fitzhugh 25 Partners v. KILN Syndicate KLN 501*, 261 S.W.3d 861, 865 (Tex. App.—Dallas 2008, pet. denied). WSP explained why replacement cost insurance works this way in its motion for partial summary judgment:

> Replacement cost insurance is optional additional coverage that may be purchased to insure against the hazard that the improvements will cost more than the actual cash value and that insured cannot afford to pay the difference. In essence, replacement cost coverage insures against the expected depreciation of the property. Unlike standard indemnity, replacement cost coverage places the insured in a better position than he or she was in before the loss. Any purported windfall to an insured who purchases replacement cost insurance is precisely what the insured contracted to receive in the event of a loss. Replacement cost coverage is, accordingly, more expensive than standard indemnification coverage.

Def.'s Mot. Partial Summ. J. [#25], at 11 (quoting *D & S Realty*, 816 N.W.2d at 14–15).

In the instant case, CMI determined the estimated replacement cost to be $1,768,052.19. After withholding an amount equal to the estimated depreciation, CMI paid WSP the roof's actual cash value of $1,238,863.85. After the roof was repaired, the parties could then determine the actual replacement cost, and WSP could recover the replacement cost if it were proven to be higher than the actual cash value.

Third, Section G(3)(e) provides:

e.      Well will not pay more for loss or damage on a replacement cost basis than the least of 1), 2), or 3), subject to f. below:

1)      The Limit of Insurance applicable to the lost or damaged property;

2)      The cost to replace the lost or damaged property with other property:

a)      Of comparable material and quality; and

-12-

> b)      Used for the same purpose; or
>
> 3)      The amount actually spent that is necessary to repair or replace the lost
>         or damaged property.

Pl.'s Trial Ex. 1, at 25.

CMI and WSP have different views on "the cost to replace the lost or damaged property" in (2) and "the amount actually spent that is necessary to repair or replace the lost or damaged property" in (3). CMI essentially argues "the cost to replace" is the amount of the CEI contract—$816,852—and "[s]ince $816,852 is less than the amount [WSP] contends was incurred by it, being the $2,450,000 of the 'contract' with the non-existent entity, Innotech, $816,852, represents the measure recoverable under the replacement cost coverage of the policy." Pl.'s Proposed Findings of Fact and Conclusions of Law [#43], at 17. "Since the cost to replace the roof was less than the actual cash value payment [of $1,238,863.85] made by [CMI], no further amount would be owed to [WSP]." Pl.'s Post Trial Brief [#52], at 5.

WSP contends the "the cost to replace" in (2) was the estimated cost of repairs provided in the Lon Smith Estimate—$1,768,052.19—and the "amount actually spent" in (3) was the amount of the Innotech contract for roughly $2.45 million. Because (2) is less than (3), WSP argues it is entitled to the proceeds held back by CMI until the repairs were made (the withheld depreciation).

The case law is consistent with respect to the operation of replacement cost provisions. The "cost to replace, on the same premises, the lost or damaged property with other property of comparable material and quality used for the same purpose" is the amount an appraisal panel estimates is the cost to repair or replace the damaged property with property of comparable material and quality and used for the same purpose. *Maryland Cass. Co. v. Knight*, 96 F.3d 1284, 1293 (9th Cir. 1996). The amount due will be the cost of the actual expenses or this estimate. *Id.*; *see also SR*

*Int'l. Bus. Ins. Co. Ltd. v. World Trade Ctr. Props., LLC*, 445 F. Supp. 2d 320, 332–33 (S.D.N.Y. 2006). If the insured party spends less to repair the roof than the estimated replacement cost, the insured is entitled to the amount actually spent. *See Lincoln Fountain Willas Homeowners Ass'n v. State Farm Fire & Cas. Ins. Co.*, 39 Cal. Rptr. 3d 345, 351 (Cal Ct. App. 2006); *Estes v. State Farm Fire & Cas. Co.*, 358 N.W.2d 123, 124–25 (Minn. App. 1984); *Huggins v. Hanover Ins. Co.*, 423 So. 2d 147, 150–51 (Ala. 1982).

Applying these principles to the instant case, WSP is correct regarding "the cost to replace" in G(3)(e)(2); it is the $1,768,052.19 Lon Smith Estimate provided up front before any repairs were done. WSP is incorrect, however, regarding "the amount actually spent that is necessary to repair or replace the lost or damaged property" in G(3)(e)(3). WSP argues it is the $2.45 million dollar Innotech contract, but the record is clear this $2.45 million figure is baseless. Lauren Laurent testified she took the Lon Smith Estimate and added 10% overhead, 10% profit, and sales tax to arrive at the $2.45 million contract price to replace the existing modified bitumen roof with a TPO roof. The Lon Smith Estimate, though, was the estimated cost to replace the existing modified bitumen roof with a new modified bitumen roof. In addition, the Lon Smith Estimate already included sales tax. The record establishes CEI, the subcontractor Innotech hired, performed the re-roofing work in a "turnkey job." Innotech's role was minimal at best, and neither Ms. Laurent, nor anyone else, could explain, nor even attempt to explain, how or why the $2.45 million figure was legitimate. Moreover, even if 10% overhead, 10% profit, and sales tax were added to the CEI contract price, the total would still not exceed the $1.2 million actual cash value payment made by CMI to WSP. Indeed, Ms. Laurent acknowledged the $2.45 million figure was incorrect, and claimed the intention of the parties was to conduct an appraisal after the repairs were finished to

-14-

calculate the amount actually spent. This supposed appraisal never occurred. These issues arose after the repairs were made, and CMI approached WSP on the amount actually spent.

Given this record, WSP's position that $2.45 million is "the amount actually spent that is necessary to repair or replace the lost or damaged property" is untenable. WSP could not establish "the amount actually spent" even if it tried because the Innotech "records" and "books" were a mishmash of nonsensical calculations. Innotech had and continues to have zero experience with roofing projects. David Winn apparently used Innotech because the Laurents were his property managers, and there remained roughly $500,000 of available insurance proceeds based on the Lon Smith Estimate. In addition, Winn testified he entered the contract knowing WSP would have no liability whatsoever under the contract other than insurance proceeds received. To complete this irrational alleged contract between WSP and Innotech, Innotech also had no liability to WSP; the contract was a sham.

Unlike Innotech's specious numbers, the record shows the only amounts actually spent that were necessary to replace the roof were the payments to CEI and additional payments to WSP by CMI. CEI is a legitimate roofing company—unlike Innotech—with experience in the industry and competent, professional employees. CEI did all of the work to remove the existing modified bitumen roof and replace it with a TPO roof at a total cost of $816,852. This figure best describes "the amount actually spent that is necessary to repair or replace the lost or damaged property." WSP complains it is not correct to just look at CEI's costs because that cost was Innotech's liability, and WSP never contracted with CEI. As noted, though, Ms. Laurent testified Innotech was to be paid 10% overhead and 10% profit. The evidence establishes, even if Innotech's alleged overhead and profit were added to the CEI contract, the total cost would not exceed the $1.2 million actual cash

value payment or the $1.7 million estimated cost to replace.  And it certainly does not come anywhere close to the bogus figure of $2.45 million.  Nevertheless, WSP sues pretending the $2.45 million Innotech "contract" is real and should be used as the measure of "the amount actually spent." The record simply contradicts these allegations.

In sum, the Court finds "the cost to replace" under G(3)(e)(2) was the $1,768,052.19 from the Lon Smith Estimate provided up front before any repairs were done.  The "amount actually spent that is necessary to replace" under G(3)(e)(3) was $816,852, or, alternatively, this figure with 10% overhead and 10% profit added.  Because $816,852(and its alternative with 10% overhead and 10% profit added) is less than $1,768,052.19 , then $816,852 is the limit of the replacement cost coverage under the Policy.  Since the actual cash value payment of $1,238,863.85 CMI already paid WSP is greater than this replacement cost coverage, CMI does not owe WSP any further amount.

The Court finds CMI complied with its obligations under the Policy, and is not liable as alleged.  Accordingly, CMI owes no further payments to WSP than those already rendered.

## II.    Extra-Contractual Claims

In addition to its own declaratory judgment action and breach of contract claim, WSP filed counterclaims for: (1) breach of the common law duty of good faith and fair dealing and (2) violations of the Texas Insurance Code Sections 542.056 and 542.058.

Under Texas law, while insurance coverage claims and bad faith claims are by their nature independent, "in most circumstances, an insured may not prevail on a bad faith claim without first showing that the insurer breached the contract." *Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996) (citing *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994)).  Texas Insurance Code Section 542.056 required

CMI to notify WSP in writing of the acceptance or rejection of a claim no later than the fifteenth business day after CMI received all items, statements, and forms required to secure final proof of loss. Texas Insurance Code Section 542.058 required CMI to pay claims within sixty days of receiving all items, statements, and forms required to secure final proof of loss.

WSP argues CMI acted in bad faith by, among other things, (1) not timely processing the claim, (2) not timely telling WSP why it had withheld depreciation, and (3) not timely paying the withheld depreciation WSP believes it is entitled to. WSP argues CMI violated Texas Insurance Code Sections 542.056 and .058, because by November 16, 2011, when WSP's public adjuster Eric Raisman sent CMI a packet which indicated Innotech's contract sum for the work performed amounted to $2,450,450.02, CMI had all the information it needed to determine its liability to pay the withheld depreciation. Since CMI did not accept or reject the claim within fifteen days or pay the withheld depreciation within sixty days, WSP argues CMI violated these provisions.

As demonstrated above, however, WSP has failed to show CMI breached the insurance contract. CMI did timely pay the actual cash value of the loss on the damaged property, and while WSP complains CMI did not pay the withheld depreciation, the record shows CMI does not owe WSP these funds. Therefore, WSP's claims for bad faith and its complaint, pursuant to Section 542.058, that CMI never paid the withheld depreciation fail. In addition, WSP's arguments concerning acceptance or rejection of the claim within fifteen days of receipt of Raisman's packet fails because, as described above, $2,450,450.02 is a bogus figure. Around the same time as receiving Raisman's packet, CMI learned of the subcontractor CEI's commercial building application, which indicated CEI was re-roofing the Spectrum Building for approximately $800,000. The discrepancy in these figures rightly alarmed CMI, and CMI immediately began investigating the

specifics of the actual costs to replace the damaged property.  Soon thereafter, CMI filed a lawsuit, which established via the bench trial that WSP is not entitled to the withheld depreciation, and CMI was correct in not paying this sum.

Therefore, CMI is entitled to judgment on WSP's counterclaims for (1) breach of the common law duty of good faith and fair dealing and (2) violations of Texas Insurance Code Sections 542.056 and 542.058.

### Conclusion

The purpose of premium replacement cost coverage is to place "the insured in a better position than he or she was in before the loss," and "[a]ny purported windfall to an insured who purchases replacement cost insurance is precisely what the insured contracted to receive in the event of a loss." Def.'s Mot. Partial Summ. J. [#25], at 11 (quoting *D & S Realty*, 816 N.W.2d at 14–15). This explains why the insured receives the actual cash value payment before repairs, and if after repairs are complete, the amount actually spent to repair the roof exceeds the actual cash value, then the insured is entitled to that amount.  If the amount actually spent is less than the actual cash value, then the insured gets to keep the full amount of the actual cash value.  In this case, WSP was paid $1,238,863.85 for the actual cash value of the existing modified bitumen roof before repairs as seed money to replace the roof.  The roof was replaced with a higher quality roof with a longer warranty for $816,852, or, alternatively, this figure with 10% overhead and 10% profit added, both of which are less than the actual cash value of the previous roof.  WSP has benefitted from its replacement cost coverage.  Yet WSP seeks withheld depreciation in order to pay Innotech on the baseless $2.45 million contract.  All the while, WSP has already forwarded the insurance proceeds it received from CMI (over $1.4 million) to Innotech, WSP is not liable to Innotech for more than the insurance

proceeds received, and WSP cannot be sued by Innotech under their contract. Both CMI and WSP have satisfied their obligations under their insurance contract, and neither party has any more obligations concerning this insurance claim.

Accordingly,

IT IS ORDERED that Plaintiff Central Mutual Insurance Company's Motion for Summary Judgment [#21] is DENIED;

IT IS FURTHER ORDERED that Defendant White Stone Properties, Ltd.'s Motion for Partial Summary Judgment [#25] is DENIED;

IT IS FURTHER ORDERED that Plaintiff Central Mutual Insurance Company has no further liability to Defendant White Stone Properties concerning Defendant's insurance claims for hail damage incurred to the building located at 9900 Spectrum Drive, Austin, Texas;

IT IS FINALLY ORDERED that Defendant White Stone Properties TAKE NOTHING on its counterclaims against Plaintiff Central Mutual Insurance Company.

SIGNED this the _18th_ day of March 2014.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE